UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>MOSES CROWE and<br>RANSON LONG PUMPKIN,<br><br>                    Defendants. | CR. 18-50010-02 & 03-JLV<br><br>ORDER |

## INTRODUCTION

A grand jury indicted defendants Saul Crowe, Moses Crowe and Ranson Long Pumpkin on charges of carjacking resulting in serious bodily injury and discharging a firearm during a crime of violence.   (Docket 2).   Saul pled guilty to both charges.[1]   (Docket 74).   Mr. Crowe and Mr. Long Pumpkin proceeded to trial and were found guilty of all charges.[2]   (Dockets 237 & 238).   They now move for a new trial.   (Dockets 244 & 245).   Mr. Long Pumpkin argues the government presented insufficient evidence to sustain his convictions and that the court erred in instructing the jury on aiding and abetting law.   (Dockets 244

---

[1]To avoid confusion, the court refers to Moses Crowe, one of the remaining defendants in this case, as Mr. Crowe.   Saul Crowe is referred to as Saul.   Saul and Mr. Crowe are brothers.   (Docket 268 at p. 92).

[2]Mr. Crowe and Mr. Long Pumpkin were tried on a second superseding indictment.   (Docket 185).   Mr. Crowe was also charged with and convicted of possessing a firearm as a felon.   Id.; see also Docket 237.   He does not seek a new trial on this count.

& 280).   Mr. Crowe argues the court denied him a fair trial by limiting his cross-examination of government witnesses and that the weight of the evidence is contrary to the verdict.   (Dockets 246 & 282).   The government opposes both motions.   (Dockets 283 & 287).   The court denies the motions.

## I.   Facts

This factual recitation is drawn from the trial transcript, exhibits, the parties' filings and the court's recollection of events at trial.[3]

### A.   Carjacking & assault

On October 11, 2017, Phillip Moore lent his vehicle, a white Dodge Grand Caravan, to Jessica Maho.[4]   (Docket 268 at pp. 56-57).   Ms. Maho and Mr. Moore were "really good friend[s.]"   (Docket 270 at p. 59).   While Ms. Maho had the van, she gave Saul a ride.   Id. at p. 63.   Saul was dating one of Ms. Maho's close friends at the time, Vanessa High Pipe.   Id. at pp. 59, 80.   Saul did not like Mr. Moore.   Id. at 63.   Ms. High Pipe had been friends with Mr. Moore since they were children.   Id. at p. 92.   An amplifier was stolen from Mr. Moore's van while Ms. Maho had it.   (Docket 268 at p. 57).

---

[3]The trial transcript is filed in seven separate volumes, three of which are sealed.   (Dockets 222-272).   Six of these volumes are continuously paginated, while the voir dire transcript is separately paginated.   To avoid confusion, the court cites to the transcript by docket number and ECF page number.

[4]Jessica Maho previously went by Jessica Cleveland and Jessica Swan. (Dockets 270 at pp. 57-58 & 271 at p. 55).   She prefers the name Jessica Maho, so the court uses that name in this order.   (Docket 270 at p. 78).

During the late evening of October 12 or early morning of October 13, Mr. Moore, Ms. Maho, Ms. High Pipe, Saul and Zach Perry were at a Walmart store.[5] (Dockets 268 at pp. 55-56 & 270 at pp. 60-62, 94-96).   Ms. Maho and Mr. Perry were friends.   (Docket 270 at p. 59).   According to Ms. Maho, Ms. High Pipe attempted to buy bullets for Saul, but was stymied by the late hour.[6]   Id. at p. 61.   In the Walmart checkout line, Saul confronted Mr. Moore, accusing him of telling others he took the amplifier.   Id. at p. 62.   Mr. Moore had not brought up the missing amplifier because he did not want any trouble.   (Docket 268 at p. 57).   Saul was aggressive and loud.   Id.   The confrontation attracted the attention of the store workers.   (Docket 270 at p. 63).   The five then left the store and got into Mr. Moore's van, with Mr. Moore driving.   (Docket 268 at pp. 57-58).   Saul was sitting in the back seat.   Id. at p. 58.

Saul "wasn't like himself" and was "more and more . . . on edge" in the van. (Docket 270 at p. 96).   Ms. High Pipe saw him using his phone, but did not know who he was communicating with.   Id.   Mr. Moore dug under his seat looking for marijuana to roll a blunt.   Id. at pp. 64-65.   Saul told Mr. Moore to show his hands and asked what he was doing.   Id. at p. 65.   Saul then pulled out a gun and called Mr. Moore's name.   (Docket 268 at p. 58).   Mr. Moore turned around

_____

[5]Mr. Moore testified he was at Walmart on October 12, while Ms. Maho testified it was early in the morning on the 13th.   (Docket 268 at p. 55 & 270 at p. 61).   Government counsel stated in her opening statement that the Walmart was located on the north side of Rapid City, South Dakota, but no witness appears to have testified to the Walmart's location.   (Docket 268 at p. 34).

[6]Ms. High Pipe did not recall attempting to purchase anything for Saul. (Docket 270 at p. 95).

and saw Saul pointing the gun at him.   Id.   The gun was silver.   Id. at p. 81.

Saul told Mr. Moore to drive to the Ramkota hotel.[7]   Id. at p. 59.

 Three witnesses—Mr. Moore, Ms. Maho and Ms. High Pipe—testified to

events at the Ramkota.   According to Mr. Moore's testimony, when the group

arrived at the Ramkota, everyone left the van, while he remained in the driver's

seat.   Id.   Saul did not yell or call out for anyone.   Id.   Mr. Moore attempted to

drive the van away, but Mr. Long Pumpkin entered the van through an open rear

side door and pulled him out of the driver's seat.   Id.   Mr. Long Pumpkin was

wrestling with Mr. Moore and put him in a chokehold.   Id. at pp. 59-60.   While

Mr. Long Pumpkin was choking Mr. Moore, "another one" started punching Mr.

Moore in the face.   Id. at p. 59.   The other assailant was not Saul.   Id. at

pp. 59-60.   When asked if the other assailant was Mr. Crowe, Mr. Moore

responded, "I don't know what he looks like."[8]   Id. at p. 60.   Mr. Long Pumpkin

choked Mr. Moore to unconsciousness multiple times while Saul pointed the gun

at Mr. Moore.   Id. at p. 61.

---

 [7]Ms. High Pipe also testified that Saul pointed a gun at Mr. Moore and told
him to drive the van to the Ramkota after they left Walmart.   (Docket 270 at
p. 96).   Ms. Maho testified she did not see Saul point the gun at Mr. Moore until
they were at the Ramkota.   Id. at p. 67.   Although no witness testified to this,
the court is aware the Ramkota is located on the north side of Rapid City,
approximately half a mile from the Walmart.

 [8]Other testimony indicated Mr. Moore knew Mr. Crowe.   Mr. Moore
testified he met with Mr. Crowe's defense counsel and identified Mr. Crowe by
name.   (Docket 268 at p. 78).   Mr. Moore also testified Mr. Crowe was not at
Walmart that evening, implying he was able to recognize Mr. Crowe.   Id. at p. 80.
As discussed below, see infra Sections I.D & IV.B, the jury could have inferred
from Mr. Moore's timid demeanor during trial that he was unwilling to implicate
Mr. Crowe in the carjacking and assault out of fear.

4

Ms. Maho testified that, when the van arrived at the Ramkota, Saul told her to open the door and call for Mr. Crowe and Mr. Long Pumpkin.   (Docket 270 at pp. 65-66).   She refused and asked why, turning around to look at Saul.   Id. at p. 67.   She saw Saul pointing the gun at Mr. Moore.   Id.   The gun was a "big silver handgun."   Id. at p. 83.   She then saw Mr. Long Pumpkin enter the side door of the van and try to grab Mr. Moore.   Id. at p. 71.   She also saw Mr. Crowe run to the driver's side of the van.   Id. at p. 72.   Ms. Maho, along with Ms. High Pipe, then fled from the van.   Id. at pp. 71-72.   She returned to the van, where Saul told her "to get the fuck out of here."   Id. at p. 72.   Ms. Maho left the Ramkota.   Id. at p. 73.   It was only "a couple minutes" from the time the van arrived in the Ramkota parking lot to the time "things started happening" with Mr. Long Pumpkin and Mr. Crowe.   Id. at p. 72.

Ms. High Pipe testified that she saw Saul pull a gun on Mr. Moore in the van during the drive from Walmart to the Ramkota.   Id. at pp. 96-97.   The gun was silver.   Id. at p. 113.   Saul told Mr. Moore to pull into the Ramkota and, "seconds" later, Mr. Long Pumpkin "[went] after" Mr. Moore.   Id. at p. 98.   Mr. Long Pumpkin choked Mr. Moore out in the van.   Id. at p. 98.   Mr. Moore was screaming.   Id. at p. 100.   While at the Ramkota, Ms. High Pipe saw Mr. Crowe with Mr. Long Pumpkin.   Saul told Ms. High Pipe to get back into the van.   Id. at p. 99.   He told Ms. Maho to leave.   Id. at p. 101.   Ms. High Pipe saw Mr. Crowe get into another car with Tawny Thompson.   Id. at pp. 99-100.

After the assault at the Ramkota, Saul began driving the van.   (Docket 268 at p. 61).   Mr. Long Pumpkin was in the back seat choking Mr. Moore.   Id.; see also Docket 270 at p. 100.   Ms. High Pipe was in the front passenger seat. (Dockets 268 at p. 61 & 270 at p. 100).   Mr. Perry was also in the back seat.   Id. Saul drove the group to an isolated area on Nike Road, north of Rapid City. (Docket 268 at pp. 61, 71).   Mr. Crowe followed them to Nike Road in Ms. Thompson's vehicle.   (Docket 270 at p. 101).   Mr. Moore and Ms. High Pipe testified to events at Nike Road.

Mr. Moore testified that everyone got out of the van at Nike Road.   (Docket 268 at p. 62).   He began fighting with Saul and Mr. Long Pumpkin.   Id.   Saul hit him with a pistol.   Id.   Saul, Mr. Long Pumpkin and "the other one" assaulted Mr. Moore at Nike Road.   Id. at p. 63.   Saul and "the other one" had guns, but Mr. Long Pumpkin did not.   Id. at p. 64.   Both guns were silver.   Id. at pp. 82-83.   The third assailant yelled, "Let's kill him and leave no witnesses" a couple of times.   Id. at p. 64.   Mr. Long Pumpkin dissuaded the other two from killing Mr. Moore.   Id. at p. 85.   Shots were fired to the right of Mr. Moore, but he could not see any muzzle flashes.   Id. at p. 65.   After the shots were fired, Mr. Moore was knocked out.   Id.   He woke up alone.   Id.   Mr. Moore ran through a field and found Mr. Perry, who had an eye swollen shut and bleeding cuts on his face.   Id. at p. 66.   They went to Mr. Moore's van, which wouldn't start.   Id. at pp. 66-67.   Some marijuana and a speaker were missing from the van.   Id. at p. 65.

6

Ms. High Pipe testified "[t]hey" got out of the van at Nike Road.   (Docket 270 at p. 101).   Mr. Crowe hit Mr. Perry on the head with his gun and told him to run.   Id. at pp. 101-02.   Mr. Crowe's gun was a silver .45 caliber Smith & Wesson.   Id. at pp. 102, 127.   Saul's gun was a black .9 mm.   Id. at p. 127.   Ms. High Pipe heard "the[m]" ask Mr. Moore where his gun was, but Mr. Moore did not have a gun.   Id. at p. 103.   Ms. High Pipe got into Ms. Thompson's car.   Id.   She first testified that she heard the assault of Mr. Moore, but did not see it.   Id. at pp. 103-04.   After reviewing a statement she made to Bureau of Alcohol, Tobacco and Firearms Special Agent Riley Cook ("SA Cook"), she testified she saw Mr. Long Pumpkin and Mr. Crowe assaulting Mr. Moore while he was on the ground.   Id. at pp. 104-05.   Ms. High Pipe did not see Mr. Long Pumpkin with a gun.   Id. at p. 125.   She did not testify to observing any gun shots at Nike Road.

Mr. Moore and Mr. Perry were wounded in the events at Nike Road.[9]   Mr. Moore testified he bled profusely from wounds around his eye which resulted in scarring.   (Docket 268 at p. 68).   His vision was blurry.   Id.   Ms. Maho saw Mr. Moore the day after the assault.   (Docket 270 at p. 76).   The whites of his eyes were bloody and "his face was all deformed."   Id.   It was clear to Ms. Maho "what had happened" to Mr. Moore, but she did not discuss the assault with him.   Id. at p. 77.

---

[9]Mr. Perry did not testify.   See infra Section I.D.   A photograph of Mr. Perry from after the assault showing a large, scabbed-over wound above his eye was admitted into evidence.   Trial Ex. 36.

Mr. Moore went to the hospital on October 13, despite having no health insurance, at the urging of his girlfriend, Erin Hunter, who feared he had a brain injury.  (Docket 268 at pp. 67-69.  He reported he fell down and "hit some stairs" because he did not want police to get involved.  Id. at p. 69.  At the hospital, he learned he had a fractured nose, a bruised rib and a concussion, in addition to the facial wounds.  Id.  Dr. Nathan Long, the emergency room doctor who treated Mr. Moore, testified his records showed Mr. Moore had a broken nose, abrasions around his eye, face swelling and bruising and bleeding in the white of the eye.  (Docket 270 at pp. 9-11).  Dr. Long's records also noted Mr. Moore reported "vision changes[.]"  Id. at pp. 9-10.  Dr. Long ordered a CAT scan.  Id. at p. 10.  He had no personal memory of why he ordered the scan, but testified it was likely because of "a combination of the history and physical"—i.e., Mr. Moore reporting he fell and his displayed injuries.  Id. at pp. 26-27.

Sometime in late 2017 or 2018, Michael Wiseley had a conversation with Mr. Long Pumpkin about Mr. Moore.  (Docket 268 at pp. 125 & 127).  Mr. Wiseley did not have a good relationship with Mr. Moore.  Id. at p. 124.  Mr. Moore was dating Ms. Hunter, who was Mr. Wiseley's wife at the time.  Id.  Mr. Wiseley told Mr. Long Pumpkin he had heard "you guys got Phillip Moore[.]"  Id. at p. 125.  Mr. Long Pumpkin responded, "yeah, we smashed that dude and took his ride."  Id.  Mr. Wiseley asked if they had taken Mr. Moore's red truck, but Mr. Long Pumpkin said it was a white van.  Id.  Mr. Wiseley understood Mr. Long Pumpkin's statement to refer to the Crowe brothers because their wider conversation was about Saul.  Id. at p. 126.

8

In October 2017, SA Cook was investigating criminal offenses connected to Saul.  Id. at pp. 91-92.   He first heard about the carjacking from Amber Battista.  Id. at p. 92.   He interviewed Mr. Moore, Mr. Perry, Ms. Battista, Ms. High Pipe and Ms. Maho about the carjacking.  Id. at p. 93.   Mr. Perry showed SA Cook where the carjacking occurred on Nike Road using an aerial map.  Id. at pp. 93-94.   SA Cook searched that location.  Id. at pp. 94-95.   He found two .9 mm and five .45 caliber shell casings.  Id. at p. 95.

**B.    Car chase**

On October 24, Rapid City Police Officer Nicholas Michael observed a silver Honda Accord without a license plate or dealer tag, in violation of state law.  Id. at pp. 106-07.   He attempted to make a traffic stop, but the vehicle did not stop. Id. at p. 107.   He saw two individuals, one male and one female, leave the vehicle.  Id. at pp. 107-08.   The vehicle sped up and Officer Michael initiated pursuit.  Id. at p. 108.   He observed the vehicle slow down and two more individuals, one male and one female, leave the vehicle.  Id.   A short while later, the vehicle stopped and the driver fled.  Id. at pp. 108-09.   Police did not locate any of the vehicle's occupants.  Id. at p. 109.

Rapid City Police Officer Alexander King was dispatched as backup to Officer Michael.  Id. at p. 113.   He arrived on scene after the Accord was abandoned and assisted another officer in searching it.  Id.   He found a loaded silver .45 caliber Smith & Wesson pistol in the pouch attached to the back of the driver's seat.  Id. at pp. 114-15; see also Trial Ex. 2.   The gun was stolen.

(Docket 268 at pp. 119-20).   The pistol's grips were missing.   Id. at p. 116.
One of the grips, brown and wooden, was located in the vehicle.   Id.; see also
Trial Ex. 53.   The officers also found a box of .45 caliber ammunition, a box of .9
mm ammunition and a debit card bearing Ms. Battista's name in the vehicle.
(Docket 268 at pp. 117 & 119).

Mateo Serfontein, a former forensic examiner with the South Dakota
Forensic Lab, examined the shell casings found at Nike Road and the pistol.
(Docket 270 at pp. 29, 31, 34).   He determined the five .45 caliber shell casings
found at Nike Road were fired from the pistol recovered from the Honda Accord.
Id. at p. 35.   Mr. Serfontein could not determine when the shell casings were
fired from the pistol or who fired the pistol.   Id. at p. 36.   The pistol was
swabbed for DNA analysis, but the results were inconclusive.   Id. at pp. 32,
40-41.

Ms. Battista and Ms. High Pipe testified about the October 24 car chase.
Ms. Battista frequently hung out with Saul and knew Mr. Crowe and Mr. Long
Pumpkin.   (Docket 268 at pp. 152-54).   On October 24, Ms. Battista, Saul, Ms.
High Pipe, Mr. Crowe and Andrew Cortez were together in Ms. Battista's silver
Honda Accord.   Id. at pp. 161-62.   Saul had two guns he wanted to shoot at a
shooting range.   Id. at p. 161.   One of the guns was black and one was silver
with wood grain grips.   Id. at p. 163.   Ms. Battista saw Mr. Crowe loading the
silver gun in preparation for the shooting range.   Id.

10

At one point Ms. Battista had to take a phone call, so she let Mr. Crowe drive the vehicle.   Id.   A police officer attempted to pull them over, but Saul refused.   Id.   Saul was "waving the guns" and said "he was going to shoot the cops."   Id.   Mr. Crowe slowed the car down and Ms. Battista and Mr. Cortez jumped out.   Id. at p. 167.   When they left the car, one of the guns was on the rear floorboard and one was "in the back seat."   Id. at pp. 166-67.

Ms. High Pipe testified she observed two guns in Ms. Battista's car on October 24.   (Docket 270 at p. 107).   One was silver and one was black.   Id. at p. 116.   Saul's gun was black.   Id.   She had purchased bullets for the guns that day.   Id. at p. 106.   When the police initiated pursuit, Ms. High Pipe heard both Saul and Mr. Crowe say they would shoot at the cops.   Id. at p. 109.   Saul asked for the gun Mr. Crowe was handling—the silver gun—and placed it in the back pocket of the passenger seat.   Id. at pp. 109-10.   Ms. Battista and Mr. Cortez left the car.   Id. at p. 108.   Ms. High Pipe and Saul left the car a short while later, leaving Mr. Crowe as the driver and sole occupant.   Id.   The gun left behind in the car was Mr. Crowe's.   Id. at p. 109.

### C.   Witness impeachment trial evidence

Most of the government's civilian fact witnesses had felony convictions. Mr. Moore had six felony convictions and one misdemeanor conviction for giving a false name to a police officer.   (Docket 268 at pp. 54-55).   He was under the influence of methamphetamine during the carjacking and assault.   Id. at p. 81. He abused drugs before and after the offense.   Id. at p. 84.

11

Ms. Battista was convicted federally of conspiring to distribute methamphetamine.   Id. at p. 149.   She agreed to cooperate with the government in hopes of receiving a sentence reduction under Federal Rule of Criminal Procedure 35.   Id. at pp. 150-52, 154, 176-80.   She was a daily user of methamphetamine in October 2017, including on the date of the car chase.   Id. at p. 173.   She sold methamphetamine for Saul.   Id.

During trial, Mr. Wiseley was in custody on felony federal charges.   Id. at p. 122.   He testified pursuant to a proffer agreement in hopes of receiving a sentence reduction.   Id. at p. 123.   He had "a couple" of previous felony convictions.   Id.

Ms. Maho had five felony convictions and one misdemeanor conviction for giving a false name to a police officer.   (Docket 270 at p. 58).   Ms. High Pipe had also been convicted of a number of felonies, although the exact number was disputed.   On direct examination, she testified she'd been convicted of more than one felony.   Id. at pp. 91-92.   Mr. Long Pumpkin's counsel asserted Ms. High Pipe had six felony convictions, but she disagreed and stated she had three. Id. at pp. 117-18.

**D.    Trial**

The court addressed objections to its proposed primary jury instructions during voir dire, outside the presence of the prospective jurors.   As relevant to the pending motions, Mr. Crowe objected to the court's proposed aiding and abetting instruction, arguing Rosemond v. United States, 572 U.S. 65 (2014),

mandated more detailed instructions.    (Dockets 192 at pp. 2-3 & 266 at

pp. 23-27).    The court instructed the jury that, to convict a defendant as an

aider and abettor, they had to find the defendant knew the offense was being or

would be committed and that the defendant had sufficient advance knowledge of

the offense to withdraw before completion.    (Docket 224 at p. 8).    Mr. Crowe

argued <u>Rosemond</u> mandated an instruction with specific language requiring

proof a defendant knew his confederate would carry a gun.    (Docket 192 at

pp. 2-3).    The court rejected this argument.    (Docket 266 at pp. 26-27).    Mr.

Long Pumpkin did not take a position.    <u>Id.</u> at p. 27.

The court appointed John Dorsey to advise Mr. Perry on his Fifth

Amendment rights.    Out of concern that he could be prosecuted for admitting to

drug use in 2017 and 2019—which defendants intended to raise as a method of

impeachment—the government requested and received an order compelling Mr.

Perry to testify and prohibiting use of his testimony in future criminal

proceedings.    (Dockets 212 & 215).    Mr. Perry nevertheless refused to testify.

(Docket 271 at pp. 31-32).    His refusal was not based on the Fifth Amendment.

Under oath, he stated he refused to testify out of fear of being labeled a snitch in

prison.    <u>Id.</u> at p. 32.    The court held Mr. Perry in contempt and ordered him

placed in federal custody until he testified or the trial ended.    <u>Id.</u> at p. 35.    The

court released him from federal custody at the end of trial.    (Docket 236).

Before trial, the government became concerned Ms. High Pipe would not

appear pursuant to her trial subpoena.    (Docket 179).    She had absconded

13

from state parole and her whereabouts were unknown.   Id.   The court issued a material witness warrant.   (Docket 181).   When Ms. High Pipe was located, she told the government she had recently used methamphetamine.   (Docket 269 at pp. 41-42).   The court appointed Paul Winter to advise Ms. High Pipe as to her Fifth Amendment rights regarding the possibility of cross-examination on her drug use.   (Docket 271 at p. 39).   He advised her to invoke her Fifth Amendment privilege as to any questions about drug use after October 2017. Id. at p. 63.   Mr. Winter argued Ms. High Pipe could expose herself to criminal liability in state parole proceedings by admitting recent drug use.   Id.   Ms. High Pipe informed the court under oath she would refuse to answer questions about post-2017 drug use.   Id. at pp. 66-67.   After further discussion concerning dates of Ms. High Pipe's past state prosecution, Mr. Winter stated he would advise Ms. High Pipe not to testify about drug use during the events of October 2017.   Id. at pp. 68-72.

On the second day of trial, November 19, Ms. Maho appeared at the courthouse under the influence of methamphetamine.   (Docket 208 at ¶¶ 5-7). She informed the government she used methamphetamine during the overnight hours between November 17 and 18.   Id. at ¶ 6.   At the request of the government, the court granted a material witness warrant to place Ms. Maho in custody and prevent her from further using methamphetamine during trial. (Dockets 269 at pp. 34-36 & 209).   The court also appointed Angela Colbath, who represented Ms. Maho on state charges, as her Fifth Amendment counsel.

14

Ms. Colbath informed the court that Ms. Maho did not appear to be under the influence of methamphetamine.   (Docket 271 at p. 51).   Ms. Colbath advised Ms. Maho to invoke her Fifth Amendment privilege as to all questions about drug use, whether in 2017 or 2019, because of the possibility her testimony could be used against her in state probation proceedings.   Id. at pp. 53-54.   She conceded it would be unlikely for state authorities to bring drug charges against Ms. Maho for conduct in 2017.   Id. at p. 53.

The court found Ms. High Pipe and Ms. Maho had a Fifth Amendment privilege to refuse to testify to drug use during and after the offense conduct.   Id. at pp. 74-75.   The court concluded there were "real risks" that the witnesses could face state criminal penalties in probation or parole proceedings for testifying about their drug use.   Id. at p. 75.   Mr. Crowe and Mr. Long Pumpkin rejected the court's offer to facilitate a stipulation regarding the witnesses' drug use during the offense dates.   Id. at pp. 72-74.   Both defendants asserted the court would infringe their right to a fair trial by limiting cross-examination to exclude the incriminating drug use.   Id. at p. 74.   The government argued defendants had other avenues to impeach the witnesses and offered a continuance to sort out immunity from state prosecution as a remedy.   Id. at pp. 75-76.

Relying on the opinions of the United States Court of Appeals for the Eighth Circuit in United States v. Singer, 785 F.2d 228 (8th Cir. 1986), United States v. Rubin, 836 F.2d 1096 (8th Cir. 1988) and United States v. Jackson, 915

15

F.2d 359 (8th Cir. 1990), the court balanced Ms. High Pipe's and Ms. Maho's Fifth Amendment privileges against defendants' Sixth Amendment right to confrontation.   (Docket 271 at pp. 78-80).   The court concluded defendants' right to confront the witnesses could be satisfied by other lines of cross-examination.   Id. at p. 79.   Following Singer, the court found defendants' proposed questioning about the witnesses' drug use was an "inquiry into merely collateral matters, such as credibility" and held no prejudice resulted from limiting cross-examination.   Id. at pp. 78-80 (citing 785 F.2d at 242).   Both defendants objected to the court's ruling.   Id. at pp. 80-81.

During Ms. Maho's testimony, Mr. Crowe moved at a bench conference to question her regarding Ms. High Pipe's drug use.   (Docket 270 at pp. 83-84). The court granted the motion, noting it would be "an alternative method to impeach these two witnesses, if you can take the same approach with [Ms.] High Pipe.   You've developed an alternative way to introduce credibility evidence." Id. at p. 84.   Mr. Long Pumpkin objected, arguing Mr. Crowe's proposed questioning would open the door to the government inquiring about Ms. Maho's knowledge of his drug use.   Id. at pp. 84-86.   The court indicated such questioning would be objectionable on relevance grounds and possibly beyond the scope of cross-examination.   Id. at p. 86.   But Mr. Crowe decided to drop his line of questioning.   Id. at p. 87.   He did not question any witness about Ms. Maho's or Ms. High Pipe's drug use.

16

As recounted above, Mr. Moore testified extensively.   However, he refused to implicate Mr. Crowe as one of his assailants.   Ms. High Pipe and Ms. Maho both testified that Mr. Crowe was present during the assault at the Ramkota, while Ms. High Pipe testified Mr. Crowe was at Nike Road.   The court has a clear memory of Mr. Moore's demeanor during trial.   He appeared afraid, kept his head down, refused to look at Mr. Crowe and in general was soft-spoken and timid.   He testified unwillingly.   (Docket 268 at p. 55).   Outside the presence of the jury, the government argued its witness problems—Mr. Perry's refusal to testify and Ms. High Pipe's and Ms. Maho's recent drug use—were due to their fear of Mr. Crowe and Mr. Long Pumpkin.   (Docket 269 at p. 12).

The government offered other evidence of Mr. Crowe threatening witnesses.   During the pretrial conference on November 1, 2019, the parties discussed Ms. Battista's proposed testimony in Mr. Crowe's presence.   (Docket 265 at pp. 68, 74-75).   According to the government, Mr. Crowe spoke to Roxanne Barton, a federal inmate in an unrelated case, and told her "to inform Ms. Battista that she has the right to remain silent, and that anything she said can, and will, be used against her."   (Docket 210 at p. 2).   Ms. Battista, "based on her personal knowledge of Moses Crowe," understood the message to be a threat.   Id.   The government learned of the incident from Ms. Battista on November 12 and informed defense counsel that same day.   (Docket 271 at pp. 14-16).   The court excluded the evidence because the government did not identify witnesses to the statement, depriving defense counsel of the opportunity to contest its veracity.   Id. at pp. 17-18.

17

During their deliberations, the jury asked two questions.   First, they asked if Mr. Long Pumpkin had to meet the requirements listed in the court's aiding and abetting instruction to be convicted of discharging a firearm during a crime of violence.   (Docket 229).   The court responded yes with the caveat that the government did not have to prove Mr. Long Pumpkin intended to discharge the firearm.   Id.   In a second note, the jury asked if they could hang on one count as to one defendant without causing a mistrial.   (Docket 231).   The court responded that they could.   Id.   The jury returned unanimous verdicts convicting Mr. Crowe and Mr. Long Pumpkin on all counts.   (Dockets 237 & 238).

## II.   Legal Standard

Federal Rule of Criminal Procedure 33 allows the court to "grant a new trial if the interest of justice so requires."[10]   Fed. R. Crim. P. 33(a).   "The district court may grant a new trial only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred."   United States v. Sainz Navarrete, 955 F.3d 713, 718 (8th Cir. 2020) (internal quotation omitted).   "[T]he district court may weigh the evidence and judge the credibility of the witnesses to determine whether there was a miscarriage of justice that warrants a new trial."   United States v. Waloke, 923 F.3d 1152, 1156 (8th Cir. 2019) (citation omitted).   "[T]he court need not view the evidence most favorably to the verdict."   United States v. Worman, 622 F.3d 969, 977 (8th Cir. 2010) (citation omitted).

---

[10]The motions were timely filed within 14 days of the guilty verdicts.   Fed. R. Crim. P. 33(b)(2).

"However, motions for a new trial are disfavored[.]"   United States v. Anwar, 880 F.3d 958, 969 (8th Cir. 2018) (internal quotation omitted).   "A district court should not grant a motion for a new trial simply because it would have reached a different verdict."   United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007) (citation omitted).   "Rule 33 is an unusual remedy that is reserved for exceptional cases in which the evidence preponderates heavily against the verdict.   The district court must exercise the Rule 33 authority sparingly and with caution."   Anwar, 880 F.3d at 970 (internal quotations, citations and alteration removed).

### III.   Long Pumpkin's Motion

Mr. Long Pumpkin raises three issues in his motion for a new trial.   He argues:

1.   The evidence was insufficient to prove he aided and abetted another in using and discharging a firearm.   (Dockets 224 at pp. 3-7 & 280 at pp. 21-29).

2.   The court erred in instructing the jury on aiding and abetting law.   (Docket 284 at pp. 8-12).

3.   Mr. Moore did not suffer serious bodily injury.   (Docket 280 at pp. 18-21).

The court rejects each argument in turn.

### A.   Aiding and abetting use and discharge of a firearm

Count II of the second superseding indictment charged Mr. Long Pumpkin with knowingly discharging a firearm during and in relation to a carjacking. (Docket 185 at p. 2).   The government proceeded against Mr. Long Pumpkin as

19

an aider and abettor.   (Docket 283 at p. 29).   Mr. Long Pumpkin argues there was insufficient evidence to show he affirmatively acted to aid and abet another in using or discharging a firearm or intended to knowingly use a firearm. (Dockets 224 at pp. 3-7 & 280 at pp. 21-29).

Rosemond ends Mr. Long Pumpkin's affirmative act argument.   To aid and abet any offense, a defendant must "(1) take[] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."   Rosemond, 572 U.S. at 71.   For a § 924(c) offense, the Supreme Court held a defendant completes the affirmative act element by "facilitating either the [crime of violence] or the firearm use (or of course both)."[11]   Id. at 74. "It is inconsequential" whether a defendant's acts "advance each element of the offense; all that matters is whether they facilitated one component."   Id. at 74-75.   The Court found the defendant in Rosemond aided and abetted the whole § 924(c) offense by participating in the predicate drug offense, despite his claim that he did not facilitate the gun use.   Id. at 74.

The same principle applies here.   Mr. Long Pumpkin argues he did not aid and abet another in using or discharging the gun.   (Docket 280 at pp. 22-26).

---

[11]Section 924(c) creates an enhanced penalty for using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime[.]"   18 U.S.C. § 924(c)(1)(A).   The predicate offense in Rosemond was a drug trafficking crime.   572 U.S. at 67-68.   However, the Supreme Court's reasoning applies with equal force to cases where, as here, the predicate offense is a crime of violence.   Mr. Long Pumpkin does not argue otherwise.

But he participated in the predicate crime of violence—the carjacking.[12]   Mr. Moore, Ms. Maho and Ms. High Pipe all testified that Mr. Long Pumpkin assaulted Mr. Moore at the Ramkota.   There was evidence of premeditation. Ms. High Pipe observed Saul communicate with somebody via cell phone before he pulled the gun on Mr. Moore after leaving Walmart.   Saul told Ms. Maho to yell for Mr. Long Pumpkin and Mr. Crowe when they arrived at the Ramkota. Mr. Long Pumpkin and Mr. Crowe were present and ready to fight when the van pulled up at the Ramkota.   Mr. Moore was unable to regain control of his van at the Ramkota because of Mr. Long Pumpkin's assault.   Because Mr. Long Pumpkin aided the carjacking, he aided the entire § 924(c) offense, including the gun use.[13]

Mr. Long Pumpkin argues "[t]he sole issue" in Rosemond was "whether an un-armed defendant must know in advance that his cohorts would be armed" and that it "does not address whether [he] knowingly acted in some way to cause, encourage, or aid in the discharge of the firearm."   (Docket 284 at pp. 9-10).

---

[12]Mr. Long Pumpkin asserts he did not cause serious bodily injury to Mr. Moore, see infra Section III.C, but does not otherwise contest his conviction of the carjacking offense.

[13]Mr. Long Pumpkin attacks Mr. Moore's, Ms. Maho's and Ms. High Pipe's credibility, pointing to their criminal histories, drug use and conflicting testimony.   (Docket 280 at pp. 4-6, 11, 15-16).   None of Mr. Long Pumpkin's credibility arguments convince the court a miscarriage of justice occurred.   The court found these witnesses reasonably credible.   Their accounts were generally consistent internally, with each others' testimony and with the physical evidence.   The inconsistencies Mr. Long Pumpkin highlights are minor and, in the court's view, are attributable to memory lapses or fear of testifying against the defendants.

This is simply incorrect.   While, as discussed below, the Court had much to say on the intent element of an aiding and abetting § 924(c) offense in Rosemond, it also explicitly held proof of participation in the predicate offense establishes the affirmative act element.   Here, then, the government did not have to prove Mr. Long Pumpkin affirmatively acted with respect to the firearm use.   Proving he facilitated the predicate carjacking was enough.   The jury's finding that Mr. Long Pumpkin acted to aid and abet the § 924(c) offense was not a miscarriage of justice.[14]

Mr. Long Pumpkin also challenges the sufficiency of the evidence as to the intent element.   (Dockets 224 at pp. 5-6 & 280 at pp. 26-29).   Unlike the affirmative act element—where the government can prove facilitating either the predicate offense or the gun use—the intent element "go[es] to the specific and entire crime charged—so here, to the full scope (predicate crime plus gun use) of § 924(c)."   Rosemond, 572 U.S. at 76.   "An active participant in a [crime of violence] has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun."   Id. at 77.   But a

_____

[14]Mr. Long Pumpkin accuses the government of "mak[ing] blatant mis-statements of the facts" when it stated in closing arguments that he aided and abetted the discharge of the firearm by beating Mr. Moore while he was on the ground at Nike Road.   (Docket 280 at pp. 14-16).   He suggests the government committed prosecutorial misconduct.   Id. at p. 14 n.7.   As Mr. Long Pumpkin does not legally develop a misconduct argument, the court finds it waived.   In any event, trial testimony supports the government's statement. Ms. High Pipe specifically testified that Mr. Crowe and Mr. Long Pumpkin assaulted Mr. Moore while he was on the ground at Nike Road.   (Docket 270 at p. 105).   Mr. Long Pumpkin disagrees with Ms. High Pipe's testimony, see Docket 280 at p. 17, but government counsel was entitled to use it in her closing argument.

"defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to . . . . withdraw from the enterprise[.]"   Id. at 78.

> Of course, if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge.   In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission.

Id. at 78 n.9.

There was ample evidence permitting the jury to infer Mr. Long Pumpkin's intent to aid and abet the predicate offense and gun use.   Most notably, Mr. Moore testified that Saul was pointing a gun at him while Mr. Long Pumpkin was choking him out at the Ramkota.   Mr. Long Pumpkin nevertheless continued to participate in the offense.   This is the exact type of evidence sufficient to show intent under Rosemond.   Id.

Mr. Long Pumpkin's successful attempt to dissuade the Crowe brothers from killing Mr. Moore at Nike Road also shows intent.   It indicates he was aware of the danger posed by their gun use.   Furthermore, Mr. Long Pumpkin told Mr. Wiseley after the offense that "*we* smashed that dude and took his ride[,]" demonstrating shared intent.   (Docket 268 at p. 125) (emphasis added). Finally, as noted above, there was evidence that Mr. Long Pumpkin, Saul and Mr. Crowe coordinated the assault before it began.   The jury reasonably could have inferred from that evidence that Mr. Long Pumpkin was aware the Crowe brothers were carrying guns.

23

Mr. Long Pumpkin argues he "did not provide either weapon, . . . encourage or facilitate their use, . . . assist directly or indirectly in their discharges, and . . . did not use either as an instrument of assault." (Docket 280 at p. 26). But the government did not have to prove Mr. Long Pumpkin took any of those specific affirmative acts to show his intent. The court further rejects Mr. Long Pumpkin's assertion that the jury's intent finding was necessarily based "on mere speculation" because "[t]he trial record does not present a single fact from which one can find or rationally infer that [he] specifically intended to use a firearm." Id. at p. 27. The evidence outlined above was sufficient for the jury to draw inferences about Mr. Long Pumpkin's intent without speculation. No miscarriage of justice occurred.

Mr. Long Pumpkin's motion for a new trial on Count II on these bases is denied.

**B.    Aiding and abetting instruction**

Mr. Long Pumpkin challenged the court's aiding and abetting jury instruction for the first time in his reply brief. (Docket 284 at pp. 8-10). "[A]rguments raised in reply briefs often are not considered because the opposing party lack[s] an opportunity to respond." Quality Wood Designs, Inc. v. Ex-Factory Inc., Civ. 13-4101, 2014 WL 12740768 at *2 (D.S.D. Apr. 10, 2014). In addition, the court rejected this very argument during trial, at which time Mr. Long Pumpkin chose not to join Mr. Crowe's objection to the instruction. (Docket 266 at pp. 26-27). However, this significant question deserves a more

24

thorough legal analysis than the court was able to provide on the record at trial. The court exercises its discretion to consider Mr. Long Pumpkin's argument and rejects it.

Mr. Long Pumpkin's challenge originates in Rosemond. Rosemond required the government to prove an aider and abettor acquired knowledge a firearm would be used in a § 924(c) offense "at a time the accomplice can do something with it—most notably, opt to walk away." Rosemond 572 U.S. at 78. The Court rejected the government's argument that liability attaches "whenever the accomplice, having learned of the firearm, continues any act of assisting the [crime of violence]." Id. at 80. It held such a rule could penalize a defendant operating without the intent to further an armed crime of violence. Id. at 80-81. The factual question for the jury is thus "*when* [the defendant] obtained the requisite knowledge" that his confederate had a gun. Id. at 82 (emphasis in original). If a defendant "first learn[s] of the gun when it was fired and he t[akes] no further action to advance the crime[,]" he does not have the necessary intent for an aiding and abetting conviction. Id.

The court instructed the jury in accordance with these principles. It charged:

> For you to find a defendant aided and abetted the offenses charged in Counts I and II of the indictment . . . , the government must prove beyond a reasonable doubt, before or at the time the offense was committed, that the defendant:
>
>> 1. Knew that the offense was being committed or going to be committed;

> 2.     Had enough advance knowledge of the extent and character of the offense that they were able to walk away from the offense before all elements of the offense was [sic.] complete[.]

(Docket 224 at p. 8).   This instruction required the jury to find Mr. Long Pumpkin knew the § 924(c) offense—the gun use—was going to be committed at a time at which he could have walked away.   In other words, the jury had to find Mr. Long Pumpkin had advance knowledge of the gun in order to convict him.

Mr. Long Pumpkin argues the court should have instructed he "had to know in advance that one of his cohorts would be armed."   (Docket 284 at p. 9). The court did just that, albeit in different language than Mr. Long Pumpkin evidently preferred.   See United States v. Waits, 919 F.3d 1090, 1093 (8th Cir. 2019) ("A district court need not adopt a defendant's proposed instruction if other instructions given to the jury adequately cover the substance of the requested instruction.").   Had the court been instructing solely on a § 924(c) aiding and abetting offense, perhaps Mr. Long Pumpkin's argument would have had weight.[15]   But the aiding and abetting instruction covered the carjacking count as well as the § 924(c) count.   As the court explained during the instruction settlement conference, repeating the aiding and abetting instruction

---

[15]On the other hand, Mr. Long Pumpkin's argument raises another issue of jury confusion.   Rosemond acknowledged a jury could infer advance knowledge when "a defendant continues to participate in a crime after a gun was displayed or used by a confederate[.]"   572 U.S. at 78 n.9.   Mr. Long Pumpkin's proposed instruction could have misled a jury into believing such an inference is impermissible.   See United States v. Daniel, 887 F.3d 350, 359-60 (8th Cir. 2018) (approving aiding and abetting instruction explicitly permitting jury to infer advance knowledge from failure to withdraw from offense).

separately for Counts I and II with differing elements would have been "unnecessarily burdensome and difficult for the jury[.]"   (Docket 266 at p. 26). The court instead opted to give "one consolidated, accurate instruction on aiding and abetting[.]"   Id. at pp. 26-27.

The court finds no error in the aiding and abetting jury instruction.   Mr. Long Pumpkin's motion for a new trial on Count II is denied.

### C.   Serious bodily injury

Mr. Long Pumpkin's final argument pertains to his conviction on Count I, carjacking resulting in serious bodily injury.   He contends Mr. Moore was not seriously injured.[16]   (Docket 280 at pp. 18-21).   The court disagrees.

Through a statutory cross-reference, see 18 U.S.C. § 2119(2), serious bodily injury is defined as bodily injury involving "a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty[.]" 18 U.S.C. § 1365(h)(3).   "Whether an injury is serious presents a question of fact for the jury."   United States v. Morrison, 332 F.3d 530, 533 (8th Cir. 2003) (quoting United States v. Two Eagle, 318 F.3d 785, 791 (8th Cir. 2003)).   "In assessing whether the injury meets the definition of 'serious bodily injury,' the jury is to apply their common understanding of that term."   Two Eagle, 318 F.3d at 791 (citation omitted).

___

[16]The government presents argument supporting the jury's verdict on the intent to cause serious bodily injury element of the carjacking offense.   (Docket 283 at pp. 19-22).   As Mr. Long Pumpkin does not challenge that element, the court need not consider the issue.

The parties primarily debate whether Mr. Moore's physical injuries—his broken nose, bruised face and eye bleeding—constitute serious bodily injury. (Dockets 280 at pp. 18-21, 283 at pp. 23-29 & 284 at pp. 5-8).   As the court stated during the Rule 29 hearing, that is "a close question[.]"   (Docket 270 at p. 139).   However, the court need not decide it.   As the government points out, the evidence at trial, unchallenged by the defense, established that Mr. Long Pumpkin repeatedly strangled Mr. Moore into unconsciousness at the Ramkota and on the trip to Nike Road.   (Docket 283 at pp. 26-27).   The court finds the strangulation presented a substantial risk of death.

The Eighth Circuit has upheld a finding that "strang[ulation] to the point of unconsciousness" creates a substantial risk of death.[17]   United States v. Bryant, 913 F.3d 783, 787 (8th Cir. 2019).   In Bryant, the district court applied a Guidelines sentencing enhancement for "life-threatening injury" when the defendant strangled the victim into unconsciousness.   Id.   The definition of life-threatening injury under the Guidelines is quite similar to the statutory definition governing this case.   See U.S.S.G. § 1B1.1 cmt. n.1(K) (" 'Permanent or life-threatening bodily injury' means injury involving *a substantial risk of*

---

[17]Other appellate courts have found, in unpublished opinions, that strangulation constitutes serious bodily injury.   United States v. Lieba, 730 F. App'x. 480, 482 (9th Cir. 2018) (strangulation "is an injury causing 'a substantial risk of death[,]' " based on medical testimony, for assault resulting in serious bodily injury conviction); United States v. Jimenez, 649 F. App'x. 602, 604 (9th Cir. 2016) (strangulation "was life-threatening[,]" based on medical and victim testimony, for Guidelines enhancement); United States v. Mitchell, 420 F. App'x. 920, 922 (11th Cir. 2011) ("[S]trangling a person into unconsciousness involves a substantial risk of death[,]" based on medical and victim testimony, for assault resulting in serious bodily injury conviction).

*death*; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent.") (emphasis added).   Relying on medical testimony, the Eighth Circuit concluded the victim "faced a substantial risk of death when she lost consciousness."   Bryant, 913 F.3d at 787.

The government presented no medical evidence at trial that strangulation can be life threatening.   This omission distinguishes the present case from the authority cited above; in each of those cases, the government relied on medical testimony to establish the dangerousness of strangulation.   Here, medical testimony would also have provided a stronger basis for the jury's verdict. However, it was not legally necessary in the sense that the evidence does not weigh heavily against the verdict in the absence of expert testimony.   Whether Mr. Long Pumpkin's repeated strangulation of Mr. Moore into unconsciousness presented a substantial risk of death was a question within a layperson's ability to answer, "apply[ing] their common understanding[.]"   Two Eagle, 318 F.3d at 791 (citation omitted).   It takes no specialized training to infer that strangulation can kill.   The court concludes the jury could reasonably have found Mr. Long Pumpkin inflicted injury resulting in a substantial risk of death on Mr. Moore.   No miscarriage of justice occurred.

The court denies Mr. Long Pumpkin's motion for a new trial on Count I.

**IV.    Crowe's Motion**

Mr. Crowe makes four arguments in support of his motion for a new trial.

He contends:

1.     The court violated his right to confront the witnesses against him by limiting cross-examination of Ms. High Pipe and Ms. Maho.   (Dockets 246 at pp. 3-10 & 282 at pp. 4-14).

2.     The evidence was insufficient to show Mr. Crowe took Mr. Moore's van or aided and abetted Saul in taking the van. (Dockets 246 at pp. 11-12 & 282 at pp. 15-16).

3.     The evidence was insufficient to show Mr. Crowe discharged a firearm or aided and abetted another in discharging a firearm. (Dockets 246 at p. 12 & 282 at pp. 17-18).

4.     Mr. Moore did not suffer serious bodily injury.   (Docket 282 at pp. 18-20).

The court rejects each argument in turn.

**A.    Confrontation**

Mr. Crowe's primary argument in favor of a new trial relates to the court's cross-examination limitations.   The court excluded examination of Ms. Maho's and Ms. High Pipe's drug use during and after the offenses.   Mr. Crowe asserts the witnesses' testimony "was the *only* evidence in the record arguably sufficient to support a conviction on Counts I and II."   (Docket 282 at p. 11).   Accordingly, he argues forbidding him from impeaching the witnesses with their drug use violated his Sixth Amendment right of confrontation.

"The Sixth Amendment recognizes the right of defendants to confront witnesses in criminal proceedings."   United States v. Arias, 936 F.3d 793, 798 (8th Cir. 2019).   "The primary purpose of this right is to guarantee the

30

opportunity for effective cross-examination, particularly with respect to a witness's potential bias.   The right to cross-examination, however, is not without limitation."   United States v. Clay, 883 F.3d 1056, 1061 (8th Cir. 2018) (internal quotation omitted).   "[T]he right to cross-examination 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'"   United States v. Walker, 917 F.3d 1004, 1012 (8th Cir. 2019) (Kelly, J. concurring) (quoting Michigan v. Lucas, 500 U.S. 145, 149 (1991)).

One such legitimate interest is a witness's Fifth Amendment right against self-incrimination.   United States v. Rubin, 836 F.2d 1096, 1100 (8th Cir. 1988) (citing Davis v. Alaska, 415 U.S. 308, 320 (1974)).

> When a conflict of rights arises between a witness' fifth amendment privilege against self-incrimination and the defendant's sixth amendment right to confrontation, a balance must be struck.   If the subject upon which the witness refuses to testify relates to matters elicited by the government on direct examination and the defendant's counsel is prejudicially impaired in his ability to assail the truthfulness of the direct testimony, the court should strike at least the relevant portion of the testimony.   On the other hand, if the witness' invocation of the privilege prevents the defendant's inquiry into merely collateral matters, such as credibility, the defendant has suffered no prejudice and the witness' other testimony need not be stricken.   This balancing includes the effectiveness of the cross-examination as a whole.   Thus, if the defendant has available effective alternative means of exploring relevant matters on cross-examination, sixth amendment rights remain intact.

United States v. Singer, 785 F.2d 228, 242 (8th Cir. 1986) (internal citations omitted), cert. denied, 479 U.S. 883 (1986).   "In balancing these interests, the court must consider the significance of the witness' testimony and the prejudice to the defendant.   Prejudice has generally been found only in those instances in

31

which the defendant is precluded from inquiring into substantive matters about which the witness testified on direct examination." Rubin, 836 F.2d at 1100.

"The Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Arias, 936 F.3d at 799 (internal quotation omitted) (emphasis in original). "A critical factor in determining whether a defendant's right of confrontation has been violated is whether the defendant had other ways to obtain the effect that the excluded examination would have allegedly established." Walker, 917 F.3d at 1010 (internal quotation omitted).

Under these principles, the court finds Mr. Crowe's right to confront Ms. Maho and Ms. High Pipe was not violated. Their testimony was undoubtedly crucial to the government's case, but it was not the sole evidence supporting the jury's verdict.[18] Mr. Moore's testimony was perhaps more important and he was cross-examined regarding his drug use before, during and after the carjacking. Moreover, in Singer and Rubin, the Eighth Circuit held prejudice results from

---

[18]Ms. High Pipe's and Ms. Maho's most important contribution to the case against Mr. Crowe on Counts I and II was their testimony placing him at the Ramkota and Nike Road. But even without this testimony, Mr. Moore's fear of testifying, Ms. Battista's testimony that Mr. Crowe was present during the October 24 car chase with the gun used to shoot the shell casings found at Nike Road, the fact Saul and Mr. Crowe are brothers, and the indicia of premeditation, in combination, could have led the jury to infer that Mr. Crowe was the third assailant. To be sure, that case would have been far shakier than the case the jury did receive. But Mr. Crowe significantly underestimates the evidence against him by arguing he could not have been convicted without Ms. High Pipe's and Ms. Maho's testimony.

limiting cross-examination to protect a witness's Fifth Amendment privilege with respect to *substantive* matters raised on direct examination.   In Singer, the Circuit relegated cross-examination aimed at a witness's credibility to a category of "merely collateral matters" which cause "no prejudice[.]"   785 F.2d at 242. As the excluded cross-examination went only to the witnesses' credibility, a finding that its exclusion violated Mr. Crowe's right to confrontation would contravene Singer.

Nor is the court otherwise convinced that the excluded testimony was of such importance as to demonstrate a Confrontation Clause violation.   The court must consider "the significance of the witness' testimony[.]"   Rubin, 836 F.2d at 1100.   While "[p]rior drug abuse *may* be relevant when the witness's memory" is at issue, it "has no automatic effect on the credibility of a witness."   United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010) (emphasis added).   The court cannot assume the drug testimony would have swayed the jury.   Moreover, the jury was informed that Mr. Moore abused methamphetamine before, during and after the carjacking.   Jurors nevertheless believed his testimony.   The court doubts evidence of Ms. Maho's and Ms. High Pipe's drug use would have changed the verdict.   The relative insignificance of the excluded testimony weighs against a finding of violation.

Even assuming the excluded testimony was indeed crucial, Mr. Crowe had other methods to inform the jury that Ms. Maho and Ms. High Pipe abused drugs without implicating anybody's Fifth Amendment privileges.   Ms. Maho, Ms. High

33

Pipe and Mr. Moore were all close friends.   Mr. Crowe could have asked any one of them about the others' drug habits and obtained the testimony he sought.[19] The court specifically approved this approach, but Mr. Crowe refused to use it. He did not explain his choice at trial or in his briefing on the pending motion.   As he did not take advantage of the impeachment opportunity available to him, it is difficult to conclude his right to confrontation was violated.   This "critical factor" weighs heavily against Mr. Crowe.   Walker, 917 F.3d at 1010 (internal quotation omitted).

Finally, as the government argues, Mr. Crowe had other methods to impeach the witnesses.   Ms. Maho and Ms. High Pipe each had significant criminal histories, including lying to law enforcement, which Mr. Crowe did not emphasize.   Nor did he pursue other theories of bias, such as questioning the witnesses about their relationships with each other or with the defendants.   In addition, Ms. High Pipe significantly changed her story during on direct examination.[20]   Mr. Crowe did not highlight this discrepancy.   While the method and extent of impeachment is left to defense counsel's sound discretion—and the court does not doubt Mr. Crowe's assertion that impeaching the witnesses with their drug use was his "strongest argument[,]" see Docket 282

---

[19]Mr. Crowe does not argue the witnesses were unaware of each other's drug use.   In fact, evidence—available to the court and the parties, but not the jury—that each of the witnesses were using methamphetamine during the evening of the carjacking strongly suggests they used drugs together on that occasion and perhaps others.

[20]Ms. High Pipe first stated she did not directly see any assault at Nike Road.   But after reviewing a report of her interview with law enforcement, she testified she saw Mr. Crowe and Mr. Long Pumpkin assault Mr. Moore.

at p. 12—Mr. Crowe does not have a right to cross-examination to whatever extent he thinks necessary.   Arias, 936 F.3d at 799 (internal quotation omitted). The other opportunities Mr. Crowe had to impeach the witnesses also weighs against him.

In short, this is not a case where Mr. Crowe had no opportunity to confront the witnesses against him as to the veracity of their testimony.   However, Mr. Crowe labors mightily to distinguish the Singer line of cases.   (Docket 282 at pp. 8-14).   He asserts Singer and its progeny concerned factual situations where, even without the excluded cross-examination, sufficient evidence remained to support the convictions.   Id. at pp. 8-10.   He further contends the court's mid-trial balancing turned out to be erroneous because Ms. High Pipe's and Ms. Maho's testimony was more crucial to the government's case than was apparent at the time.   Id. at pp. 10-14.   These arguments are not persuasive.

Ms. High Pipe and Ms. Maho were not the only witnesses against Mr. Crowe.   As noted above, Mr. Moore was also a crucial witness.   Ms. High Pipe and Ms. Maho, at least with respect to the carjacking, gave testimony which largely corroborated Mr. Moore's account.   The court need not determine whether Mr. Moore's testimony, standing alone, would support the convictions, but it is clear Mr. Crowe's claim that Ms. High Pipe's and Ms. Maho's credibility "was the *only* issue in the trial" is simply untrue.   Id. at p. 10.   The court finds no reason to factually distinguish this case from Singer.   In addition, the Eighth Circuit did not limit its analysis in Singer or the other cases to the individual

facts of each case.   The Circuit instead set out a generally applicable balancing test that has not since been cabined.   That test is binding on this court.

As for Mr. Crowe's second argument, the court does not question that a new trial could be an appropriate remedy where excluded cross-examination may have had a significant impact on the verdict.   The <u>Singer</u> test suggests as much—a court may not be able to properly gauge the impact of excluded testimony until the trial evidence is fully presented.   But this is not that case. Here, Mr. Crowe had "available effective alternative means of exploring relevant matters on cross-examination[.]"   <u>Singer</u>, 785 F.2d at 242.   The results of the court's mid-trial balancing test are unchanged.

Mr. Crowe was not deprived of his Sixth Amendment right to cross-examine Ms. Maho and Ms. High Pipe.   His motion for a new trial on this basis is denied.

**B.    Taking of the van**

Mr. Crowe next argues "there were no facts in the record to support a fair inference that [he] took, attempted to take, or aided and abetted another person in taking [Mr.] Moore's van" as required for a conviction on Count I.[21]   (Docket 282 at p. 16).   He asserts the only trial evidence indicating his connection to the carjacking is Ms. Maho's testimony that he "ran to the front door" of Mr. Moore's van at the Ramkota.   <u>Id.</u> at p. 15.   The court disagrees.

---

[21]Mr. Crowe does not reurge his theory that the carjacking was a singular event that was completed before he became involved.   (Docket 282 at p. 15 n.2). That theory was rejected at trial and is preserved for appellate review.   (Dockets 220-22 & 272 at pp. 4-16).   The court need not revisit this debate to resolve Mr. Crowe's motion.

The government proceeded against Mr. Crowe as an aider and abettor on Count I.   "For a person to be convicted as an aider and abettor he must have 'facilitated any part—even though not every part—of a criminal venture.' " Daniel, 887 F.3d at 356 (quoting Rosemond, 572 U.S. at 72).   The government was not required, as Mr. Crowe suggests, to prove he took the van, or even directly assisted in its taking.   The affirmative act element in an aiding and abetting prosecution only requires proof that "the defendant sought by his actions to make [the offense] succeed."   United States v. Knight, 800 F.3d 491, 506 (8th Cir. 2015).   The trial evidence more than meets this standard.

There was evidence showing the carjacking was planned.   Ms. High Pipe observed Saul communicating with someone before he took control of the van. At the Ramkota, Saul told Ms. Maho to yell for Mr. Crowe and Mr. Long Pumpkin, who were at the hotel ready to fight.   Mr. Crowe ran to the driver's side of the vehicle.   Mr. Moore testified a third assailant—whom the jury could easily have inferred was Mr. Crowe—punched him at the Ramkota while Mr. Long Pumpkin as choking him out.[22]   He was unable to flee the Ramkota and was taken by

---

[22]Mr. Crowe objects to the inference that he was the third assailant. (Docket 288 at pp. 2-3).   The inference was clearly supported by trial evidence. Ms. High Pipe and Ms. Maho both testified that Mr. Crowe was present at the Ramkota.   (Ms. Maho also testified that Saul told her to call for Mr. Crowe specifically.)   Ms. High Pipe placed Mr. Crowe at Nike Road and testified he assaulted Mr. Moore there.   At trial, Mr. Moore's demeanor and body language suggested he was afraid to testify against Mr. Crowe.   The jury could have found beyond a reasonable doubt that Mr. Crowe was the third assailant at the Ramkota and Nike Road.

force to Nike Road, where, according to Ms. High Pipe, Mr. Crowe assaulted him further.[23]

The jury could have concluded from this evidence that Mr. Crowe acted to help the carjacking succeed.   His assault of Mr. Moore at the Ramkota, in concert with Mr. Long Pumpkin's assault, prevented him from fleeing.   In addition, the evidence strongly suggests premeditation—it is unlikely that Mr. Crowe just happened to be at the Ramkota, ready for a fight at a moment's notice, when his brother pulled up with a random victim held at gunpoint.   The jury could have inferred that Saul carjacked Mr. Moore in part because he knew Mr. Crowe and Mr. Long Pumpkin were at the Ramkota, ready to aid in the assault.

Mr. Crowe's conviction on Count I was not a miscarriage of justice.   Mr. Crowe's motion for a new trial on this basis is denied.

### C.    Discharge of the firearm

Mr. Crowe asserts there is no evidence showing he aided and abetted the discharge of the firearm at Nike Road.   (Dockets 246 at p. 12 & 282 at pp. 17-18).   The court does not know whether the jury found Mr. Crowe acted as a principal by discharging a firearm at Nike Road or concluded he aided and

---

[23]Like Mr. Long Pumpkin, see supra Section III.A, Mr. Crowe asserts Ms. High Pipe's testimony is not credible.   (Docket 288 at p. 6).   The court found Ms. High Pipe reasonably credible.   Relying on her testimony creates no miscarriage of justice.

abetted another in the § 924(c) offense.[24]   The court found above that Mr. Crowe facilitated the carjacking.   See supra Section IV.B.   Mr. Crowe's conviction on Count II is not a miscarriage of justice because, under Rosemond, he aided and abetted the entire § 924(c) offense by affirmatively acting to facilitate the predicate carjacking.   Rosemond, 572 U.S. at 74-75.   Alternatively, the court finds the trial evidence supports the theory that Mr. Crowe fired his gun at Nike Road.   A conviction based on this theory would likewise not be a miscarriage of justice.

Ms. High Pipe testified she saw Mr. Crowe with a silver Smith & Wesson .45 caliber handgun at Nike Road.   Mr. Moore testified that the third assailant had a silver gun at Nike Road.[25]   He also testified shots were fired.   Law enforcement later found .45 caliber shell casings at Nike Road.   A silver Smith & Wesson .45 caliber handgun was recovered from the vehicle Mr. Crowe was driving on October 24.   Ms. Battista testified Mr. Crowe was handling the silver gun in the vehicle.   Ms. High Pipe testified the silver gun belonged to Mr. Crowe. Forensic testing concluded the silver gun fired the .45 caliber shell casings recovered at Nike Road.

No speculation is required to conclude Mr. Crowe fired a gun at Nike Road. The government's evidence connects Mr. Crowe to a gun that fired shots at Nike

---

[24]As discussed above, see supra Section III.A, the government was not required to prove Mr. Crowe specifically facilitated the firearm use or discharge.

[25]Mr. Crowe argues Mr. Moore testified Saul was holding a silver handgun. (Docket 288 at p. 3).   This is true, but he also testified the third assailant had a silver gun.   (Docket 268 at pp. 64, 82-83).

Road during the assault of Mr. Moore.   The inference he fired the gun is not only permissible, but obvious.   Mr. Crowe nevertheless asserts "no witness was able to testify who may have fired th[e] gun or if had been fired at Nike Road on October 13th or on some other occasion."   (Docket 282 at p. 3).   "[A]though the evidence must be consistent with guilt, it need not be inconsistent with every other reasonable hypothesis."   United States v. Seals, 915 F.3d 1203, 1206 (8th Cir. 2019) (quoting Klein v. United States, 728 F.2d 1074, 1075 (8th Cir. 1984)). The government did not have to disprove all other reasonable explanations for the evidence it presented.   The jury could have found Mr. Crowe fired the silver gun at Nike Road in the midst of the assault on Mr. Moore.

Mr. Crowe's conviction on Count II was not a miscarriage of justice.   The motion for a new trial on this basis is denied.

### D.   **Serious bodily injury**

Mr. Crowe, like Mr. Long Pumpkin, argues the injuries Mr. Moore sustained were not serious.   (Docket 282 at pp. 18-20).   Unlike Mr. Long Pumpkin, Mr. Crowe responded to the government's strangulation argument in his reply brief.   (Docket 288 at pp. 8-9).   Mr. Crowe attempts to distinguish Bryant from the present case, arguing that the victim there suffered "petechial hemorrhages" and "external bruising and swelling," while Mr. Moore "reported no neck pain and did not exhibit any external bruising and swelling in his neck[.]" Id. (quoting Bryant, 913 F.3d at 787).   He also notes the government failed to offer medical testimony that strangulation presented a risk of death.   Id. at p. 9.

40

The government was not required to produce physical evidence that Mr. Moore suffered serious bodily injury.   "A victim's testimony alone is sufficient to persuade a reasonable jury of the defendant's guilt beyond a reasonable doubt." United States v. Goodale, 738 F.3d 917, 923-24 (8th Cir. 2013) (internal quotation and alteration omitted).   And, as discussed above, the jury did not need medical testimony to find beyond a reasonable doubt that Mr. Moore was subjected to a substantial risk of death when he was repeatedly strangled into unconsciousness.   See supra Section III.C.

Mr. Crowe's motion for a new trial on Count I on this basis is denied.

**ORDER**

For the reasons given above, it is

ORDERED that Ranson Long Pumpkin's motion for a new trial (Docket 244) is denied.

IT IS FURTHER ORDERED that Moses Crowe's motion for a new trial (Docket 245) is denied.

IT IS FURTHER ORDERED that sentencing scheduling orders for each defendant shall issue.

Dated June 22, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

41